This is a female on female sexual harassment case in which the victims were employed by a staffing company, the Appley Elwood Staffing Svc, and the alleged harasser was employed by the staffing company's client, Schlumberger, sometimes referred to as SLB in the record. SLB is not a party to this appeal. The question presented in this case is whether there is sufficient evidence for a jury to find that Elwood, as a staffing company, was independently liable or, quote, directly culpable for the events that happened to Ms. Arredondo and Ms. Coleman. Directly culpable is the standard established by this court in Burton v. Freescale Semiconductor, a case that was not even referenced by the district court. The rule established in Burton is that a staffing company is liable for its joint employer-client if it, one, either participates in the discriminatory conduct or, two, knows or should have known about the client's discrimination but fails to take corrective action within its control. This court elaborated on this standard in Nicholson v. Securitas Security Services, another case not even acknowledged or referenced by the district court in its summary judgment opinion. Ms. Williams, did you cite those cases to the district court? Yes, Your Honor, I did. To participate in the discriminatory conduct requires actual knowledge, according to Nicholson, but the staffing company is still liable if it should have known about its client's discrimination but failed to take corrective action within its control. We'll get to the facts here, because the facts, as I read them in the briefs and the record excerpts, indicated that Elwood was caught entirely by surprise by this train of events. Your Honor, the question is not, we contend that Elwood, or we acknowledge that Elwood did not have actual knowledge, but the question is whether Elwood should have known. And in that regard, the best evidence I would say that Elwood knew or should have known with respect to Arredondo's claim was the Miley Fish email at ROA 687, and that email, Miley Fish says that there is another termination for the, quote, same reason, same manager, and same segment. And with respect to the Coleman, the first termination— But she had already quit, right? Arredondo was quitting at that point. Yes, ma'am, she was quitting at that point. So by the time Elwood finds this out, Arredondo's no longer, she's not working for Schlumberger. She's already said, I quit. Well, she said that she quit, but at that point, Elwood could have investigated the claim and gone back and investigated the Coleman claim. The Coleman claim, there was plenty of evidence that should have put Elwood on notice that there was an issue, so— Ms. Coleman was already gone at that point. Yes, Your Honor, she was already gone, but these events, you have to appreciate, happened within two months of each other. Both clients— Yeah, but Ms. Arredondo had spoken against Coleman, so the notion that they should have checked out what happened with Coleman to help Arredondo when she was the one saying, and I understand she felt forced and all that, but Elwood didn't know that, so I don't understand how that was necessary for Arredondo when she's the one speaking out against Coleman at the time. But there were enough flags about the Coleman termination. This includes the close, extremely close timing on the termination. There are the emails from Elwood to Schlumberger saying, why did you terminate her? Why did you terminate her? You know there was a retaliation complaint, and all of a sudden, there are multiple emails going back and forth. That sounds like they are exploring it. They, well, they started to, but then they didn't, so at June 28th, those emails start. On July 2nd or July 3rd, they end, and there was no subsequent investigation between Elwood and Schlumberger, so if Elwood had investigated, they would have found out things like the documents to justify Coleman's termination were ex post facto. They were after the fact. They were all dated after the truth. Was she going to send Ms. Coleman back to work with a couple of very aggressive predators? Well, that is the whole issue here. No, I mean, of course they weren't going to do that. Well, as in, as in, If they knew. Well, they, that's the question. If they had, is there sufficient evidence for a jury to find that if they had conducted an appropriate investigation, if they had pressed their client to interview witnesses, if they had gotten any of the interviewing, any of the investigation documents from Schlumberger that were a sham, they would have concluded that. Well, how are they on the outside going to know what Schlumberger was doing was a sham? Well, they're joint employers, Your Honor, so. I understand that, but I doubt that most staffing companies get that deeply involved in what the purchaser of their services is doing. Well, that is exactly the reason for the rule that is established in the Burton case, because the staffing company is not allowed to just, to accept, as the court said in Burton, the, there's no contractual right to commit discrimination. So they can't just go along with the discrimination. And some of the facts that the court looked to in Burton were the fact that there was a meeting between the, or a conference between the staffing company and its client in which they established a communication plan. And this is almost exactly like the email. So how could Elwood end the discrimination? Well, Elwood could have told Schlumberger that they were not going to send their employees into that meat grinder any longer. Okay, well then that means, they did, I mean, these employees didn't go and they were offered other jobs online. So I don't understand what, they can't stop these people from discriminating because those people don't work for them, for Elwood. And so it would seem like Elwood would move forward as it did. It said we have stuff online and neither one, Ms. Arredondo or Ms. Coleman, tried to get any other job, some other company that Elwood had. Your Honor, I believe, we believe that a jury could find that Elwood had to do more than just say, look at our website. Elwood's the one who puts the jobs on the website. Coleman, in particular, who lives actually in the New Orleans area and was traveling out to West Texas where these events arose, Coleman said she was open geographically to placement. But she didn't make a single request on any of these things that were online. I mean, Elwood has a limited amount of what they can offer. They can't make up a place to work. So they offered what's there and she wasn't interested in any of that. I'm just struggling with what more they should do. Call her up and say please look online? I mean, she was already told that. Well, there's no evidence that every position that Elwood had was posted online. Elwood, as a staffing service, that's what they do. They go out and recruit employees for their clients. And in fact, Coleman and Arredondo were both recruited by Elwood to work for Schlumberger, one at a recruiting event, if you will. Was there any evidence that there were jobs they didn't articulate that Coleman or Arredondo could have used? No. Okay, well then that's hard to beat a summary judgment when you can't show that. But there was no evidence that there weren't jobs available or that there were jobs available that just were no efforts made by Elwood at all to place them in any type of position. And frankly, reinstatement is the traditional remedy for employment discrimination cases coming out of original Title VII. They could have gone back to Schlumberger and said, look, there's a problem with this supervisor. You need to do something about it or put her in a different position. Do you think those ladies would have willingly gone back to Schlumberger under these circumstances? In other words, the person who investigated this very unfortunate, disgusting conduct was himself in league with the perpetrators. You yourself call it a sham investigation. Why would anybody go back to work for an employer who isn't enforcing the discrimination law? Well, I absolutely agree they did not want to go back to that same environment, but that suggests that Schlumberger would not have taken any measures to correct it, perhaps if it had gone above the level where the sham investigation was taking place. So, we respectfully contend that there is, I mentioned the Meal A Fish email with respect to Arradondo, but the best evidence was regarding, with respect to Coleman, where, as I said on the retaliation claim, the Elwood emails that are in ROA 669 to 676 where they're stating there's no reason given and under Elwood's policy, Elwood violated its own policy because its policy requires an investigation and it did no investigation. With respect to the quid pro quo claim, this is the issue of the supervisory status and the district court held, based on a single statement in the declaration of one of the Schlumberger employees, that this perpetrator, Brenda Mitre, was not a supervisor, but there's abundant evidence in the record that she was. This includes references from Elwood describing her as a manager, references from Schlumberger employees describing her as a manager. There were two statements of co-workers who identified her as a manager and this is surely at least sufficient evidence for a jury to find that she was a manager or she at least was acting with apparent authority of a manager. And how does that fit in with Elwood's know or should have known responsibility? Well, I mean, I'm looking at the Burton case and it just says, if the staffing agency knows or should have known of the client's discrimination that fails to take corrective measures within its control. And I don't see, I might agree with you that there is a genuine issue about whether she was functionally a supervisor, but I don't see how that ties in with their knowing or should have known. Well, the district court didn't even reach Elwood's conduct because it held that there was no quid pro quo claim. So I believe that we have an obligation to show that there were material fact issues on that question. But once that is established, there's evidence that Elwood knew she was a manager or thought she was a manager and that's contained in the... But you're still liable for discrimination. It's an easier standard if she was a supervisor, but there's also co-worker Title VII harassment. So I'm not sure how that changes Elwood's legal responsibility. I don't think it changes Elwood's legal responsibility because Elwood still has a responsibility if it should have known about that harassment, which we contend they should have known about the harassment of Arradondo from the harassment of Coleman. But Mitri left Schlumberger, right? So it's not still there. She's not still there. Well, yeah, she left after all of these events occurred. But Arradondo never breathed a word to anybody. Correct? That's true until she... No, Your Honor, actually that's not true. She reported to Carrasco, who was Mitri's direct supervisor, but Carrasco said, don't go apply... Carrasco said, don't tell the HR because I'll get fired. She certainly never said anything... I mean, they both violated Elwood's policy, which is to tell the staffing agency if they're the subjects of discrimination. Neither one of them complied with that policy until it was too late. Well, Coleman complied with it when she was terminated. I mean, she didn't know she was going to get terminated until it happened. But what was happening along the line? I mean, the very first time that something happened, shouldn't they have reported that to Elwood? And then things could have been perhaps fixed before they became as bad as they did? Well, I think, Your Honor, it's a matter of, you know, cumulative acts that occur in a workplace, and are you going to complain about every little thing, or are you going to wait until it becomes a situation where you can't tolerate it anymore, or there's some other conduct? Well, I thought Coleman asked to take the evening and then was put back in the day. And wouldn't that be a time to contact Elwood? Your Honor, I'm out of time. May I answer? Well, she was trying to... She was afraid that if she complained, she would be retaliated against. That is a common concern of many individuals in the workplace. And she tried to make whatever corrective action she could by requesting to be put on the different shift, but that was denied. Okay. Well, you have an opportunity for rebuttal later. Thank you, Your Honor. Ms. Stacy? May it please the Court. I will first address Ms. Coleman's three claims on appeal, and then Ms. Arredondo's two remaining claims on appeal. As I believe you noted from review of the briefing, the allegations in this case were detailed, egregious, but Elwood really had not much to do with this at all. Our only involvement came when each of these ladies were separated or resigned, in the case of Arredondo, from Schlumberger. And at that point, Elwood did what it could to make it known that they could apply for other jobs within the staffing company. They were not immediately separated. They remained eligible for placement of other jobs. And that is all that could be done in the circumstances. Okay. What about this argument that they should have actually contacted them and said, hey, go to XYZ, and so on, and more of an interaction? What's your response to that? I think that's a good question. The only evidence in the summary judgment record is the declaration of John Niedermeyer from Elwood regarding Elwood's standard policies and practice in these situations. And there's no evidence in the record that Elwood in any way failed to follow its practice on alternative placements. Elwood is not a staffing company that only services Schlumberger. Sometimes you see that in the staffing company cases. And particularly with Ms. Coleman, she outlined what her requirements were for a new position, that it include a per diem, as she had with Schlumberger. Elwood directed her to look on the website, and Ms. Coleman stated there were no job postings that met her requirement. I think something more would need to be required for that to be an adverse employment action, such as Elwood deeming her ineligible for placement elsewhere, or like in a failure-to-hire case, you actually apply for the position and then do not receive it. That would be closer to establishing an adverse employment action than simply Ms. Coleman taking no action at all. Were there positions on the website that she could have taken? Ms. Coleman testified that she did look on Elwood's website, as she had been directed to do so, but the positions that were posted did not offer the per diem she desired, so she did not take any further action. I would note with regard to Ms. Coleman's retaliation claim here on appeal, we believe that argument has been forfeited. In her summary judgment briefing, Ms. Coleman spent eight pages of her briefing talking about the retaliation she experienced from Schlumberger. It did not once mention any sort of protected activity as against Elwood, let alone an adverse employment action that followed. This was noted in the district court's opinion, that Ms. Coleman did not respond to Elwood's summary judgment briefing on this matter. Now on appeal, there is a new argument by Ms. Coleman, and that is that her post-release complaint was protected activity. Even assuming it was protected activity, she never argued or identified any sort of adverse employment action that followed her post-release complaint to Elwood. Both Elwood, I mean both Arredondo and Coleman were very clear that they never reported any of the issues to Elwood at a time where it could have made a difference. That is the reason why employers have policies, especially in a situation like this where Elwood did not have its own employee on site, its Schlumberger. And it was clear in their contractual agreements that they were supposed to complain to Elwood, right? And the documentation that both Ms. Coleman and Ms. Arredondo were provided at the time of the hire with Elwood, they were provided with Elwood's policies that indicated they should immediately report any concern, particularly of this nature, to Elwood so that Elwood could review the matter. With regard to Coleman's claim of quid pro quo, the issue before the district court really focused on whether or not Ms. Maitrey was a supervisor. If she was at all, it was for Schlumberger, not for Elwood. And as this court noted during Ms. Williams' argument, even if Ms. Maitrey was a supervisor, it is unclear what Elwood could have done or how it would have made Elwood liable in these circumstances where there was never a complaint made to Elwood during these ladies' employment. With regard to Coleman's race-based hostile work environment claim, her complaint largely focused on the fact that Brenda Maitrey, who again was a Schlumberger employee, and Ms. Carrasco, Maritza Carrasco, also a Schlumberger employee, that they spoke Spanish in the workplace. Ms. Coleman stated that she did not understand Spanish, she did not speak Spanish. She testified that she asked a gentleman who worked with her, either Antonio or Jose, what they were talking about. And this gentleman said, yeah, they're talking about work, and they're talking about some of the workers, but nothing more than that. Nothing more than that was identified. Coleman also testified that she received some translation from Ms. Arredondo, who spoke Spanish. Ms. Coleman testified that Arredondo said that Ms. Maitrey and Ms. Carrasco were referring to the workers as stupid and that they didn't want black people to work inside and they wanted to get rid of the black people. This is what Ms. Arredondo shared with Ms. Coleman. This was the extent of Ms. Coleman's testimony. She never indicated that she was present for these comments or, if she had been, that she would have understood them or that they were directed at her. On appeal, much focus is paid to what I will admit are the most egregious comments alleged to have been made by Ms. Maitrey. Ms. Coleman testified the extent of what Ms. Arredondo told her. The testimony in the record forming the basis for these very egregious comments comes from Ms. Arredondo. Ms. Arredondo testified she did not recall if she had ever even shared those comments or those translations with Ms. Coleman. Moreover, Ms. Arredondo stated that these comments, these very egregious comments from Ms. Maitrey were directed toward a gentleman whose name she could not remember. It was not even about Ms. Coleman. To be clear, there's no evidence in the record that Ms. Coleman even knew about these alleged comments, let alone that they were about her. It came solely from Ms. Arredondo's testimony. So the other evidence of harassment was the lunch? The lunch where Maitrey was coming on to her? Ms. Coleman did state that it was her perception that Ms. Maitrey, Ms. Carrasco, Ms. Arredondo and another Hispanic female would go to lunch together and that Ms. Coleman was not invited to eat with them at lunch. But as the district court noted, both Ms. Coleman and Ms. Arredondo acknowledged having lunch together. Ms. Arredondo stated that she frequently ate lunch with Ms. Coleman. There was a particular event that Coleman mentioned, right? When she had lunch and Maitrey and maybe Carrasco as well were making sexual overtures to her? My apologies, Your Honor. I misunderstood your question. Ms. Coleman's allegation is that while they were in the workplace, Ms. Maitrey came up to Ms. Coleman and some other folks and engaged in an inappropriate conversation about Bourbon Street and having sex with each other and asking Ms. Coleman if she was gay. Three times. Ms. Arredondo is the one who went to off-site lunches where there were allegations of touching. One of the points that Ms. Williams made in her argument is that Elwood should have been aware at least of Ms. Arredondo's situation because of Ms. Coleman's complaint. If you review Ms. Coleman's complaint, she made no mention of Ms. Arredondo. If anything, the only reference to Ms. Arredondo was that Ms. Arredondo was receiving more favorable treatment. What Ms. Coleman alleged in the written complaint to Elwood was that this exchange in the workplace where Ms. Maitrey engaged in this inappropriate conversation about Ms. Coleman's sexual orientation and whether she was gay, that is very, very different from what Ms. Arredondo alleged and that is severe instances of sexual assault occurring outside the workplace. It is our position that Ms. Coleman's complaint to Elwood would have never alerted Elwood that there was that sort of harassment going on against Ms. Arredondo, let alone outside of the workplace. Your point is coming on to somebody is very different from rape. Very much so, Your Honor. In other words, we've unfortunately all seen the cases where inappropriate conversations take place in the workplace and whether those result in a cognizable legal claim is factually specific, but those things happen. Certainly it's not as foreseeable that something of the nature of what Ms. Arredondo alleges would take place, certainly outside of the workplace. And again, Ms. Coleman just gave no indication that Ms. Arredondo was in any way subject to some sort of harassment by Ms. Maitrey or anyone else. With regard to Ms. Arredondo's claim of hostile work environment based upon her sex, again, it is that notion of what Elwood should have known and whether there was any sort of appropriate remedial action taken. Ms. Arredondo admittedly did not complain to Elwood and she said that she did not do so because she believed it would be futile. There are instances in which an employee's failure to complain can be excused, but this is not the case. Ms. Arredondo seeks to link what happened with Ms. Coleman as excusing her own failure to make a complaint to Elwood. But yet in her deposition, Ms. Arredondo stated that she was not aware of Ms. Coleman's situation prior to Ms. Arredondo's resignation. So that could not have deterred her from contacting Elwood and making a complaint. It is also interesting to me and what stood out to me about this case the most throughout its litigation is that Ms. Arredondo happened to meet with a member of HR from Schlumberger not once but twice. This could have been, she admitted it very well, could have been after the alleged rape with Ms. Maitrey and she said nothing. Yet at the same time, Ms. Arredondo freely complained to Schlumberger's human resources representative that a male employee had inappropriately touched her, had come up behind her and grabbed her hips and that another male employee had sought to give her back rubs. So why on the one hand would someone feel comfortable complaining about alleged harassment by two different male employees and not do the same when it comes to such egregious allegations? How did anybody get work done at Schlumberger? That was my question. There was not a whole lot of work going on. And importantly, to keep in perspective, I recognize that some staffing cases are the facts and the relationships are more interwoven than they are here. We've talked about Burton, we've talked about Nicholson, and if you look at the facts of those cases, the staffing companies were much more involved in the situation than Ellwood was here. In Nicholson, for example, the facts of that case was it was an 83-year-old woman who had been working for the client customer for a number of years when she was suddenly let go to be replaced by a 20-something year old. And in that case, the staffing company testified that they always investigated the reasons for someone being let go because it was unusual. Here, the summary judgment evidence showed that Ellwood, that is not Ellwood's practice. They have a lot of people coming and going and while they will seek to understand why someone is let go, they do not engage in the type of investigation of the type that was at issue in Nicholson and certainly did not deviate from any practice here. That's where the law ends up coming back on what ought to happen. I would agree, Your Honor. When the law says they can be liable if they knew or should have known, then we're going to be hands off and see no evil. Too bad. I do think that the issue of whether they knew or should have known and taken corrective measures is a factually specific inquiry. And so when you look at the underlying facts in both Burton and in Nicholson, you could readily understand why the staffing company had more skin in the game than the situation here. In Burton, for example, the staffing company admittedly expressed... But what about her argument that once Coleman was fired and complained about what had happened that they should have done more than they did and that that might have helped with Aradondo? Well, I think there, quite frankly, I don't think the record is well developed in that regard. Ms. Williams stated that there's an email chain that goes back and forth where Elwood alerted Schlumberger as to Ms. Coleman's complaint and provided the witness statements that it had received. And Ms. Williams noted that the email chain stopped on the heels of a conversation between Schlumberger and Elwood, and there was no discovery taken as to what happened. Did they have a conversation? So you're saying they didn't raise a fact issue on that? That's correct, Your Honor. And Elwood's representative did certify in his declaration that Elwood was eventually informed that Ms. Coleman was terminated for a policy violation related from arising out of Schlumberger's investigation of Ms. Coleman's own wrongdoing. There was nothing about those circumstances that would have suggested any of the conspiracy theories that had been advanced relative to everyone colluding against Ms. Coleman. Well, isn't it true that Aradondo quit only a week or two after Coleman? No, Your Honor, so... Or was it a month? It was about a month, so... But she had already been raped at that point. That's correct, Your Honor, and that So they couldn't have stopped that in any event. That is an accurate observation. Ms. Coleman was released from her assignment on June 28th. On June 29th is when she verbally notified Elwood of the events, and according to Ms. Aradondo, the alleged rape with Ms. Maitre occurred on June 23rd. Finally, I would just briefly mention Ms. Aradondo's claim for constructive discharge. Constructive discharge is certainly a high threshold to meet in the Fifth Circuit, and I'm not here to offer any opinion, of course, as to whether she would have met that threshold as to Schlumberger, but an objectively reasonable person would have reached out to prior to abruptly resigning employment to allow Elwood the opportunity to remedy the situation. That part of her claim is what made summary judgment appropriate for Elwood. Unless the Court has any other specific questions, I believe I've adequately covered the points in the brief, and I appreciate your consideration and time today. All right. Thank you. Ms. Williams, rebuttal. Thank you, Your Honor. I'd like to address the waiver issue first. It's clear in the record that the District Court did consider the issue of whether the complaint, Ms. Coleman's complaint to Elwood contemporaneous with her termination, if that was protected activity. This is in ROA 1155. On the issue of the adverse employment action, I believe that was argued below at ROA 432, but it can't be seriously argued that the failure to place the employee in another position is not an adverse employment action. An adverse employment action, as defined by this Court and the Supreme Court, is something that is a hiring, firing, failure to hire, and I believe that that is very apparent in the case law. As far as the issue of saying that the clients were not immediately separated, and Elwood did what it could, Elwood claims that the only action it could have taken was by advising of eligibility for other work assignments. That's the statement in the brief, but then they provide no evidence that there were any other work assignments that the clients were eligible for. But did they have the power to send her back to Schlumberger, and did she really want to go back there and have more problems? No, Your Honor, I don't think she would have gone back there Okay, so what could they have done? Just with Coleman. Let's put her down to a side for a moment. Let's just say Coleman. She doesn't want to go back. She gets fired. She doesn't want to go back. They give her other options. She doesn't like any of them. What else were they supposed to do? Well, they did not give her Actually, they did not give her any other options. Well, they told her the website. The website had options. She didn't like those options. What, and you have no proof that there was some options she would have liked that they held back. So what evidence is there of something else that they held back from her? Well, there's no evidence that they necessarily held anything back, but there's no evidence that they offered anything either. This is a summary judgment. There's evidence that she checked the website and she didn't pick anything. I mean, there's only so much they can do, right? They can't force other companies to hire her. So they have what they have. They put it on the website. You're not contending there is evidence that, oh, they had something sitting in their bucket but they didn't let her know. Just that she didn't like what they did have. Well, what were they supposed to do about that? I think that a reasonable jury could find that there were other positions available that they did not make. And can you cite me where that is, what evidence there is of that? There is no evidence. Okay, then how can a jury find that when there's no evidence? Juries only can review the evidence. They're stuck with the evidence in the case. Nothing else. And the law is directed by the jury. But they are allowed to make reasonable inferences. And as counsel argued, Ellwood is a large company. Schlumberger is not its only client. Schlumberger is a large client. There could have been other positions available. Is it your position that Ellwood should have offered Coleman the per diem? No, Your Honor. I would not take that position. I mean, that's your client's choice. Well, I believe, Your Honor, if you look at her deposition testimony, I don't believe that that is exactly what she said in the deposition. I think she said there were no other jobs available, and then Ellwood characterized it as because of her per diem. And in the record below, there are multiple places where Ellwood mischaracterized the evidence. And this is by saying that they offered her a position when they didn't offer her a position. There's a chart in my brief that contrasts the testimony between Ellwood and Coleman on these points. It's at page 7 of the brief. So they say that Coleman did not contact Lafayette office until a month after termination, but she did, in fact, contact the Lafayette office the day after she was terminated. And there are other examples there in the brief. Respectfully, we just urge that there are jury questions here. Well, we will look carefully at the record. Thank you very much. Thank you, Your Honor. And we will stay in recess for less than 10 minutes. All rise.